FILED
CLERK

4:11 pm, Oct 04, 2017

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
MICHAEL BABINO, *individually*,

                          Plaintiff,

                - against -

THOMAS GESUALDI, JOSEPH FERRARA, SR.,
LOUIS BISIGNANO, FRANK FINKEL, ANTHONY
D'AQUILA, MARC HERBST, MICHAEL O'TOOLE,
DENISE RICHARDSON, MICHAEL BOURGAL,
THOMAS CORBETT, *as Trustees and Fiduciaries of the
Local 282 Pension Trust Fund, Local 282 Welfare Trust Fund,
Local 282 Annuity Trust Fund and the Local 282 Vacation
& Sick Leave Fund*, THOMAS J. RYAN, *Administrator*

                          Defendants.
------------------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**
15-cv-3575 (ADS)(AKT)

**APPEARANCES:**
**Dandeneau & Lott**
*Attorneys for the Plaintiff*
425 Broadhollow Road
Suite 418
Melville, NY 11747
          By:     Gerald V. Dandeneau, Esq., of Counsel

**Cohen Weiss & Simon**
*Attorneys for the Defendants*
330 West 42nd Street
New York, NY 10036
          By:    Tzvi N. Mackson, Esq.,
                  Michael Seth Adler, Esq., of Counsel

**SPATT, District Judge:**

        This action was brought by the Plaintiff Michael Babino (the "Plaintiff") against the

Defendants Thomas Gesualdi, Joseph Ferrara, Sr., Louis Bisignano, Frank Finkel, Anthony

D'Aquila, Marc Herbst, Michael O'Toole, Denise Richardson, Michael Bourgal, and Thomas

Corbett (collectively, the "Trustees"), as trustees and fiduciaries of the Local 282 Pension Trust

Fund (the "Pension Fund"), the Local 282 Welfare Trust Fund (the "Welfare Fund"), the Local 282 Annuity Trust Fund (the "Annuity Fund") and the Local 282 Vacation & Sick Leave Trust Fund (the "Vacation Fund," collectively with the Pension Fund, the Welfare Fund, and the Annuity Fund, the "Funds"), and Thomas J. Ryan, Administrator (collectively, with the Funds and the Trustees, the "Defendants"), seeking recovery of pension, welfare, annuity, and vacation benefits allegedly due pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").

Presently before the Court are cross-motions from the Plaintiff and the Defendants for summary judgment pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 56, as well as a motion by the Plaintiff to amend his complaint pursuant to Rule 15. For the following reasons, the Plaintiff's motions are denied in their entirety, and the Defendants' motion is granted in its entirety.

## I.  BACKGROUND

### A.  The Relevant Facts

The majority of the facts in this case are undisputed. The following facts are drawn from the Plaintiff's response to the Defendants' 56.1 Statement (the "SMF"), as well as the Plaintiff's supplemental 56.1 Statement.

#### 1.  The Funds

The Funds are "employee benefits plans" and "multiemployer plans" as defined by ERISA. The Funds provide various benefits to covered employees of employers who sign collective bargaining agreements with Building Material Teamsters Local 282, International Brotherhood of Teamsters ("Local 282"). Covered employees receive pension benefits, welfare plans, vacation benefits, and medical benefits from the Funds. The Funds are jointly administered by the Trustees.

The Funds are maintained pursuant to a Restated Agreement and Declaration of Trust (the "Trust Agreement"), for the purposes of collecting and receiving contributions from employers bound by collective bargaining agreements with Local 282.  The Funds incorporate by reference the Trust Agreement, which require employers to contribute monies to the Funds on behalf of those employees who perform work covered by collective bargaining agreements.

Only those employees who perform covered work qualify for benefits.  As demonstrated below, the Funds' documents do not clearly identify "covered work," but instead refer to the collective bargaining agreements for what work is covered.

The Trust Agreement requires employers to submit reports ("remittance reports") to the Funds that set forth the number of hours worked by covered employees.  In order to verify the accuracy of these remittance reports, the Funds conduct regular audits of employers, and may conduct an audit at any time pursuant to the Trust Agreement.

In addition to the remittance reports, the Funds also analyze "Hired Truck Reports," which are referred to as "shop steward reports," or "steward reports" in the industry.  These steward reports are filled out each week by two different types of stewards: barn stewards, and on-site stewards.  Barn stewards work for the truck driver's employer, and work out of the "barn" where the truck drivers typically start their day.  On-site stewards work for the company for the company for whom the truck driver is performing a service.  Both stewards are appointed by the Union, and all steward reports are sent to the Fund's office.

### 2.  Oakfield Leasing, Inc.

Oakfield Leasing, Inc. ("Oakfield") provided trucking services to customers.  The Plaintiff's mother owned Oakfield until 2010, after which time Babino's father owned it.

3

Oakfield was a party to two collective bargaining agreements with Local 282 during the relevant period—the New York City Heavy Construction & Excavating Contract (the "Heavy CBA"), in effect from July 1, 1993 through June 30, 2006; and the Metropolitan Trucker's Association and Independent Trucker's Contract, in effect from July 1, 2006 through June 30, 2012 (the "MTA CBAs") (collectively, the "CBAs").

The Heavy CBAs list the following employees as covered by the agreement: automobile chauffeurs; Euclid and turnpull operators; and drivers of six wheeler tractors and trailers, heavy equipment trailers, and boom trucks. (SMF ¶¶ 34–36). The MTA CBAs each state that "[t]he terms and conditions of this Agreement shall apply to the Employees of the Employer on any day they drive a dump truck, flatbed trailer, or flo-boy." (SMF ¶ 38). The Plaintiff claims that "covered work" encompasses more than just driving, and cites to affidavits from two individuals, discussed below.

Between July 1995 and July 2012, Oakfield submitted remittance reports to the Funds that indicated that the Plaintiff worked for Oakfield. The remittance reports did not specify the type of work in which the Plaintiff engaged.

### 3. Coral Industries, Inc. and the Initial Lawsuit

The Plaintiff was the owner, sole officer, and only shareholder of Coral Industries, Inc. ("Coral"). Coral also provided trucking services to customers.

At some point in the late 200s, the Funds sought to audit both Oakfield and Coral (the "Companies") because of multiple perceived connections between the Companies. Namely, the Funds sought to determine whether Oakfield had reported all hours of covered employees and paid the required corresponding contributions. The Companies failed to submit to the audit, and so in 2011, the Funds sued the Companies and the Plaintiff in the United States District Court for the

Eastern District of New York.  The case, *Ferrara et al. v. Oakfield Leasing Inc. et al.*, 11-cv-408 (ADS)(WDW) (the "Oakfield Lawsuit"), was assigned to this Court.

On November 9, 2012, the Court granted summary judgment to the Funds.  *Ferrara v. Oakfield Leasing Inc.*, 904 F. Supp. 2d 249 (E.D.N.Y. 2012) (the "2012 Decision").  The Court found that Coral and Oakfield were a single employer; ordered the Companies to submit to an audit; and found that the Plaintiff was jointly and severally liable with the Companies for the Companies' obligations to the Funds.  Relevant here, the Court found that Coral was bound by the CBAs, and that Coral therefore owed monies to the funds for covered work done by Coral's employees.

The Trustees audited Coral and found that Coral owed $875, 729.20 in unpaid contributions for Coral drivers covered by the CBAs.  The Court awarded the Funds those unpaid contributions. *Ferrara v. Oakfield Leasing Inc.*, No. 11-CV-408 ADS WDW, 2013 WL 1207066, at *2 (E.D.N.Y. Mar. 23, 2013) (the "2013 Decision").

### 4.  The Funds' Evidence Purportedly Supporting Their Decision To Terminate His Benefits

On January 28, 2013, the Funds received a letter allegedly sent by Anthony Bassolino ("Bassolino") and purportedly signed by five other employees of the Companies (the "Employees' Letter").  Bassolino stated that he drove for Oakfield beginning in October 2005, and worked as a barn steward for Oakfield from August 2009 until July 2012.  As a barn steward, Bassolino was given the task of entering time sheets for drivers to track when Oakfield employees engaged in covered work.  The Funds used these time sheets to verify covered work.

Bassolino claimed that the Plaintiff ran the daily operations at Oakfield while Bassolino worked there, and the Plaintiff told him to list the Plaintiff on three 8-hour tours per week.  Yet Bassolino said that he never saw the Plaintiff drive a truck after 2007, and said that he could

"confirm with certainty [that] he did not drive a regular tour while [Bassolino] was [s]tewar[d]." (Def.'s Ex Bulding BB).  Bassolino had believed that the Plaintiff was one of the owners of Oakfield, but once he discovered that he was not, he sought to bring the matter to the Funds' attention.  The other five signatures purportedly belong to John Minutillo, Joseph Mollin, Michael Zizzo, Jean Policard, and Anthony Zaffuto, each of whom worked for either Oakfield or Coral. Joseph Mollin worked for both companies.

 While the Plaintiff does not dispute the existence of this letter, he disputes the veracity of the statements made in the letter.

In a letter dated January 24, 2014, the attorneys for the Defendants informed the Trustees that during discovery in the Oakfield Lawsuit, they had spoken to, Anthony Zaffuto ("Zaffuto"), one of the signatories to the Employees' Letter.  Zaffuto had allegedly told the Defendants' attorneys in a telephone interview that the Plaintiff would take Zaffuto's driving tickets and write his name over Zaffuto's, so that the Plaintiff could maintain coverage under the Funds.

The Plaintiff alleges that Zaffuto and Babino were biased because they were both plaintiffs in an action brought against the Plaintiff and the Companies for violations of the Fair Labor Standards Act.  The Plaintiff also points out that Bassolino received cash wages when he worked for Coral.

Also during the Oakfield Lawsuit, the Plaintiff testified in a deposition that Coral paid some of its drivers in cash, because "[t]hat's what they wanted."  (Defs.' Ex. Mackson C at 164). The Funds state that this cash policy is what caused Coral to owe over $875,000 to the Funds.

## 5.  The Termination of Babino's Coverage

On January 28, 2014, the Trustees terminated Babino's coverage under the Welfare Fund because of the allegations in the Employees Letter and from Zaffuto, as well as Coral's cash

payments to its employees.  The Trustees also disregarded all hours Babino reportedly worked for

Oakfield.  On April 14, 2014, the Trustees informed Babino via letter (the "April 2014 Letter")

that they were terminating his Welfare Fund benefits, and that they would subtract his Oakfield

hours from his credits he had earned in the Pension and Annuity Funds, unless he could prove that

he engaged in covered work during those hours.  At the time, the Plaintiff was fully vested in the

Pension Plan.  The letter further informed Babino that because his Welfare Fund coverage was

retroactively rescinded, he owed $106,719.65 for medical claims that had been "wrongfully paid"

on his behalf. (Defs.' Ex. Bulding DD).  The letter from the Trustees stated:

> It has come to the attention of the Trustees of the Local 282 Pension, Annuity, and
> Welfare Trust Funds (the "Funds") that in your capacity as principal of Coral
> Industries, Inc., ("Coral"), you caused Oakfield Leasing Inc. ("Oakfield") to report
> hours worked by you to the Funds in order to allow you to claim benefits from the
> Funds, despite your never having worked for Oakfield or Coral in covered
> employment. As you know, Oakfield was held to be a single employer with Coral
> in *Ferrara, et al., v. Oakfield Leasing, et al.*
>
> Accordingly, the Trustees have determined to disregard all hours of work reported
> by Oakfield on your behalf to the Local 282 Pension and Annuity Trust Funds,
> unless you are able to prove to the Trustees' satisfaction that you did work in
> covered employment for Oakfield or Coral by providing documentation of such
> work, including, but not limited to, delivery tickets, driving tickets or customer
> invoices from the period in question.  If the hours of work reported on your behalf
> to the Funds are disregarded, Pension Credits reflected in your records for the
> Pension Fund attributable to hours reported by Oakfield will be eliminated, and any
> amounts in your Annuity Fund Individual Account attributable to Oakfield's
> contributions will be taken away.
>
> The Trustees have also determined to terminate your coverage under the Local 282
> Welfare Trust Fund (the "Welfare Fund") permanently pursuant [to] the section
> entitled "Fraud" on page 46 of the Welfare Fund's January 1, 2013 Summary Plan
> Description ("SPD"). Specifically, in addition to fraudulently causing hours to be
> reported on your behalf to the Welfare Fund despite your not having performed
> covered work, you also caused drivers for Coral Industries Inc., who were Welfare
> Fund Participants, to be paid in cash for their covered work, and you were aware
> that Oakfield would therefore not report such hours of covered work to the Welfare
> Fund. Due to these fraudulent activities, as of the date of this letter, you and your
> Dependents (as that term is defined in the SPD) are permanently banned from

7

receiving benefits from the Fund, even if, in the future, an employer makes contributions to the Fund based on your hours of covered work.

Moreover, because you engaged in the fraud as described above against the Welfare Fund, your coverage under the Welfare Fund is retroactively rescinded. According to our records, medical claims in the amount of [$106,719.65] were wrongfully paid on behalf of you [and your covered Dependents] during this period when you were not, in fact, eligible for the coverage. You must reimburse the Welfare Fund for these amounts by May 14, 2014, which is 30 days from the date of this notice.

You have the right to appeal this decision to the Board of Trustees. Your appeal must be in writing and must be made within 180 days of your receipt of this letter. You have the right to review documents relevant to this decision. You will be notified of the Trustees' decision within 30 days of receipt of your appeal. If your appeal is denied, you have the right to bring a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

(SMF ¶ 102)

Mario Bulding (Bulding), who was the Funds Administrator as of April 28, 2016, testified in his deposition that, after reviewing the Trust Fund Summary Plan Description (the "SPD"), that there was nothing in the document that "provides for the revocation of pension hours based upon the happening of a particular event or circumstance[.]" (Defs.' Ex. Mackson J at 56)

On May 27, 2014, counsel for Babino sent a letter to the Funds (the "May 2014 Letter") which stated that the Funds' allegations were false; and unless the Funds' decision were reversed, Babino would commence legal action. The May 2014 Letter stated in relevant part:

[Y]our allegations that Mr. Babino had hours fraudulently reported for him by Oakfield Industries, Inc., a signatory to the Local Union 282 collective bargaining agreement is false. This allegation is belied by your very own documents in the nature of Steward Reports that were filed by your designated shop steward for Oakfield Industries, Inc.

Your allegations that Mr. Babino defrauded the Funds by paying Local 282 members for work performed by them when driving for Coral Industries, Inc. and not reporting the same to the Funds also cannot legally stand scrutiny predicated upon fraud allegations. In the event that the Funds' decision is not immediately reversed, we will commence all necessary legal action to recover damages and restitution. In accordance with your communication, please advise me when I may

review all of the documentation the Funds' utilized in making this determination,
including all shop steward reports and remittance reports.

(SMF ¶ 104).

On September 8, 2014, counsel for the Funds responded to counsel for Babino's May 2014

letter via letter ("The September 2014 Letter").  The letter stated that the Trustees would consider

Babino's request at their next meeting on September 23, 2014.  The Employees' Letter, Babino's

deposition excerpt, and the Funds' counsel's report from the Oakfield Lawsuit, along with shop

steward reports and remittance reports requested by Babino, were included with the letter.  The

Funds' Counsel informed Babino that if he wished to provide any documents for the Trustees to

consider, he should provide those documents to them before the meeting.  The September 2014

Letter stated in relevant part:

> With regard to your request that the Funds' decision be reversed, we assume that
> this request refers to the Funds' decision to terminate Mr. Babino's coverage under
> the Welfare Fund. We also assume that this refers to the Funds' decision [to]
> disregard all hours of work reported by Oakfield on Mr. Babino's behalf to the
> Local 282 Pension and Annuity Trust Funds based on his fraudulent activities
> unless he is able to provide documentation of such work including, but not limited
> to, delivery tickets, driving tickets or customer invoices from the period in question.
> The Trustees will consider your request at their next scheduled meeting, which will
> be held on September 23, 2014. If you wish to provide any documents for the
> Trustees to consider with respect to their determination, please provide them in
> advance of the meeting.
>
> With respect to your request for "all documentation the Funds utilized in making
> this determination," we assume that you are referring to the same decisions that you
> are asking the Funds to reverse.  In response to your request, we have enclosed the
> following:
>
> (a) A letter from Anthony G. Bassolino, former shop steward for Oakfield, signed
> by Mr. Bassolino and other employees of Oakfield;
>
> (b) An extract from the transcript of a deposition of Mr. Babino conducted on
> November 4, 2011 in the matter of Ferrara, et. al, v. Oakfield Leasing Inc., et al.,
> Case No.: 11-cv-0408 (AJS)(WDW) (E.D.N.Y); and

(c) An extract from this firm's report to the Funds' Trustees, dated January 24, 2014, reporting, in addition to the above, statements by Anthony Zaffuto, a former employee of Oakfield.

In addition, you requested copies of shop steward reports and remittance reports. We have enclosed, in response, the Funds' records of such reports relating [to] Mr. Babino.

(SMF ¶ 106)

On September 20, 2014, the Plaintiff's counsel emailed the Funds' counsel to inform that he was still obtaining supporting documentation for his client. The Funds' counsel responded by letter on September 24, 2014, stating that the Trustees would delay decision on the Plaintiff's request until October 28, 2014 in light of the special circumstances.

Babino did not submit any documentation on or before October 28, 2014. As of March 2015, the Plaintiff had not sent any supporting documentation. In March 2015, the Trustees denied his appeal. On March 25, 2015, the Funds' counsel sent a letter to the Plaintiff informing him that they had not received any documents from him, and that they had denied his appeal.

### 6. Babino Supplies Documentation to the Trustees

In June 2015, three months after his appeal was denied, the Plaintiff sent seventy daily driving tickets from Oakfield that covered seventy days from 2006 to 2009. The daily driving tickets purportedly proved that he engaged in covered work during those seventy days. The tickets only indicate the first name of the driver – either "Mike" or "Michael" in each instance; they do not state the driver's last name.

Those seventy tickets are the only Oakfield driving tickets that the Plaintiff possesses. Before her death, the Plaintiff's mother stored Oakfield's driving tickets. After her death, the Plaintiff stored the driving tickets for Oakfield as well as for Coral. The Plaintiff admits that he

10

did not store the driving tickets in alphabetical order; and he is unaware whether his mother stored them in alphabetical order.

### 7. The Trustees Restore Babino's Work Hours and Vacation Benefits

Although the Trustees never decided to withhold the Plaintiff's vacation and sick leave benefits, those benefits were withheld after the Trustees rescinded the Plaintiff's Welfare Fund benefits.  The Defendants assert that the Trustees never decided to withhold his vacation and sick leave benefits, and that any withholding was an error.  In support, the Defendants cite to Bulding's deposition.  Bulding attributed the error to his predecessor, who was deceased at the time of Bulding's deposition, and said that the reason the Funds did not pay the Plaintiff's vacation benefits was a "mistake."  (Defs.' Ex. Bulding J at 63).  The Plaintiff asserts that it was not error, but a conscious decision by the Funds.  He cites to page 82 of Bulding's deposition, but that page refers to the Welfare Fund.  However, Bulding did respond yes when asked whether "[t]he initial decision to not pay [the Plaintiff] his vacation money was made at the same time that the [T]rustees decided to revoke his pension and annuity credits."  (*Id.*).

The Plaintiff also cites to his complaint generally, as well as his counsel's declaration which states that "[t]hey refused to give him his vacation earning for work performed for his new employer, CCC Leasing, Inc., and only did so after this action had been initiated . . . ."  (Pl.'s Ex. 3, Decl. of Dandenau ("Pl.'s Ex. 3") ¶ 18 (citing complaint)).

As to the complaint, because it is not a verified complaint, it is not admissible evidence for the purposes of a motion for summary judgment.  *See Sloane v. Getz,* 2002 WL 31132968, at *1 (S.D.N.Y. Sept. 25, 2002) ("Because [plaintiff's] original, amended, and second amended complaints were unverified, they may not serve as affidavits for purposes of summary judgment.") (citing *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir. 2000)); *Yearwood*

*v. LoPiccolo,* 1998 WL 474073, at *5 (S.D.N.Y. Aug.10, 1998) (stating that "no effect need be given at summary judgment" to an unverified complaint) (footnote omitted).

As to Dandenau's declaration, a declarant can only affirm facts of which he has personal knowledge.  Fed. R. Civ. P. 56 ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.")  Therefore, as the Plaintiff's counsel cannot swear or affirm to the Trustees' state of mind—that they "refused" to give the Plaintiff his money—the only admissible evidence to which the Plaintiff cites is the fact that the Funds did not pay the Plaintiff until after he initiated this lawsuit.

On August 3, 2015, the Funds sent a check for $3,697.50 to Babino, payable to him for his past due Vacation Fund benefits.  Babino deposited the check, and admits that the check represented all of the Vacation Fund benefits that had been withheld and that were due to him.

During the course of the litigation, on-site steward reports were produced in discovery. The on-site steward reports were originally in the Trustees' possession, but they had been provided to the Plaintiff by the Trustees with their September 2014 Letter.  The on-site steward reports showed that the Plaintiff drove approximately four thousand hours for Oakfield from 1995 to 2012. On May 24, 2016, the Trustees restored 3,928 hours to the Plaintiff's Annuity and Pension Funds. The Plaintiff denies that he worked as few hours as the Trustees claim.  The Plaintiff points to the shop steward reports and his Work History compiled by the Defendants as evidence that he engaged in covered work from June 1995 until June 2012.

### 8.  Further Evidence

The Plaintiff also submitted two affidavits from individuals.  These affidavits were not considered by the Trustees and are not part of the administrative record.

Michael Bird, a Local 282 Business Agent and Union Trustee, testified that truck drivers in Local 282 would be "paid the 282 wage and benefit" when they "would load up the trucks . . . [and] clean the yard up." (Defs.' Ex. Mackson Supp. A at 14). The Plaintiff cites to this testimony in support of his claim that "covered work" under the CBAs includes more than just driving trucks.

Michael Pellegrino ("Pellegrino"), who worked for Oakfield for more than ten years, including as the shop steward for Oakfield from September 2009 through May 2010, also submitted an affidavit. Pellegrino stated in an affidavit that he saw the Plaintiff drive trucks "regularly" for Oakfield. He said that the Plaintiff would drive a truck three to four times a week on average. Pellegrino claimed that maintenance and repair work was covered under Local 282's contracts, and said that when the Plaintiff did not drive he dispatched other drivers and did maintenance work. Finally, Pellegrino averred that the Plaintiff had never asked him to credit the Plaintiff with hours that he did not earn; nor had Pellegrino ever heard the Plaintiff ask that of anyone else.

### 9. Relevant Terms of the Funds' Plans

#### a. The Annuity Fund's Plan

The terms of the Annuity Fund's plan of benefits are set out in its Rules and Regulations (the "Annuity Plan").

The Annuity Plan defines an employee as "a person who is an Employee of an Employer and who is covered by a Collective Bargaining Agreement, Participation Agreement, or any other written agreement requiring Employer contributions on his or her behalf." (Defs.' Ex. Bulding I at Funds 001951).

The Annuity Plan vests the Trustees with the discretion to administer and interpret the Annuity Plan. It states that:

The Trustees shall be responsible for the general administration of the Plan. The Board of Trustees shall have the exclusive right, power, and authority, in its sole and absolute discretion, to administer, apply and interpret the Plan and any other Plan documents and to decide all matters arising in connection with the operation or administration of the Plan, including, but not limited to, determining the standard of proof required in any case based upon objective standards.

(Defs.' Ex. Bulding O at Funds 0150).  Furthermore, the Annuity Plan provides that "[a]ll interpretations, determinations and decisions of the Plan Administrator and the Trustees with respect to any claim or any other matter relating to the Plan shall be made in their sole discretion based on the Plan documents, and shall be final, conclusive and binding on all parties affected thereby."  (*Id.* at Funds 0157).

As to applications for benefits, the Annuity Plan states that:

Every Employee, Annuitant or beneficiary shall furnish, at the request of the Trustees, any  information or proof required for the administration of the Plan, or for the determination of any matter that the Trustees may have before them. Failure to furnish such information or proof promptly and in good faith shall be sufficient reason for (i) the denial of benefits to such Employee or beneficiary . . . .  The falsity of any statement, material to an application, or the furnishing of fraudulent information or proof shall be sufficient reason for the denial, suspension or discontinuance of benefits under this Plan and, in any such case, the Trustees shall have the right to recover any benefit payments made in reliance thereon.  An Employee's acceptance of payment in cash or otherwise from an employer (as defined in Article I, Section 1 of the Trust Agreement) for hours of work in employment covered by a Collective Bargaining Agreement or Participation Agreement with Local 282 that have not been reported to the Funds, where the Employee knew or should have known that the hours would not be reported, shall constitute sufficient reason for the Trustees, in their discretion, to deny, discontinue, suspend, reduce, or otherwise impair the Employee's nonvested benefits and those provided to his or her beneficiaries.

(*Id.* at Funds 150).

Finally, as to vesting, the Annuity Plan states that employees:

are 100% vested in [their] Individual Account balance under the Plan at all times. This means that [beneficiaries] have a nonforfeitable right to all Employer Contributions obligated to be made on [their] behalf and any earnings on these Contributions. (The fact that [they] are 100% vested in your Individual Account balance does not mean, however, that [they] are eligible to receive a distribution

14

prior to your retirement or severance from employment. Eligibility rules are set forth below.) The vested benefits to which [employees] are entitled are nonforfeitable, except that they may be subject to forfeiture resulting from criminal acts committed against the Plan, in accordance with applicable law.

(*Id.* at Funds 0111).  It similarly states later in the plan that "The benefits to which an Employee is entitled under this Plan are nonforfeitable, subject only to conditions as to application, and willful misrepresentation . . . ."  (*Id.* at Funds 0157).

### b.  The Pension Fund's Plan

The terms of the Pension Fund's plan of benefits are contained in the Pension Fund's Rules and Regulations (the "Pension Plan").  The Pension Fund Summary Plan Description (the "Pension Fund SPD") summarizes the terms of the Pension Plan.

The Pension Fund SPD states that "[y]ou may participate in the Plan if you work for a Contributing Employer in a position covered by a Collective Bargaining Agreement with the Union . . . .  Such employment is referred to as "Covered Employment."  (Defs.' Ex. Bulding X at Funds 0178).  Furthermore, it states that "[y]ou earn Pension Credit for periods of work in Covered Employment . . . ."  (*Id.* at Funds 0190).  Pension benefits available from the Pension Fund are based, in part, on the number of Pension Credits an eligible participant accrues.

The Pension Plan vests the Trustees with the discretion to administer and interpret the Pension Plan.  It states that:

The Trustees shall, subject to the requirements of the law, be the sole judges of the standard of proof required in any case and the application and interpretation of this Plan, and decisions of the Trustees shall be final and binding on all parties. Wherever in the Plan the Trustees are given discretionary powers, the Trustees shall exercise such powers in a uniform and nondiscriminatory manner. The Trustees shall have discretionary authority to interpret and construe the terms of the Plan and any other Plan documents and to decide all matters arising in connection with the operation or administration of the Plan, including specifically, but not by way of limitation, the right to determine questions regarding Pension Credits, eligibility, amount, type and effective date of benefits, survivor rights, Beneficiary designations, marital status, disability claims. All such determinations and

interpretations made by the Trustees shall be made in a consistent and nondiscriminatory manner, shall be final and binding upon all Participants, Beneficiaries and all other individuals claiming benefits under the Plan, and shall be given deference in all courts of law to the greatest extent allowed under applicable law and shall not be overturned or set aside unless found to be arbitrary and capricious or made in bad faith.

(Defs.' Ex. Bulding V at Funds 0280).

With regard to applications for benefit payments and retirement the Pension Plan states

that:

Every Participant or Pensioner shall furnish, at the request of the Trustees, any information or proof reasonably required to determine his benefit rights. If the claimant makes a willfully false statement material to his application or furnishes fraudulent information or proof, material to his claim, benefits not Vested under this Plan (as defined in Section 6.9) may be denied, suspended, or discontinued. The Trustees shall have the right to recover any benefit payments made in reliance on any willfully false or fraudulent statement, information, or proof submitted by a Participant or Pensioner.

(*Id.* at Funds 0279).

### c. The Welfare Fund's Plan

The terms of the Welfare Fund's plan of benefits appear only in the Welfare Fund's

Summary Plan Description (the "Welfare Fund SPD").

The Welfare Fund SPD provides, in a section entitled "Fraud," that:

Subject to the terms of the Affordable Care Act, the Fund reserves the right to terminate coverage for you and/or your Dependent(s) if you and/or your Dependent(s) are otherwise determined to be ineligible for coverage. Pursuant to the Affordable Care Act, the coverage will not be rescinded retroactively, except in certain instances, such as if you or your Dependent(s) commits fraud or makes an intentional misrepresentation (for example, in enrollment materials, a claim, or appeal for benefits or in response to a question from the Fund administrator or its delegates). In such cases of fraud or intentional misrepresentation, your coverage may be rescinded retroactively upon 30 days' notice. Failure to inform the Fund Office that you or your Dependent is covered under another group health plan, and knowingly providing false information to obtain coverage for an ineligible Dependent are examples of actions that constitute fraud or intentional misrepresentations. Coverage may also be eliminated retroactively (without notice) in cases in which it would not be considered rescission under the Affordable Care

16

> Act, such as failure to pay a required premium or contribution toward the cost of coverage. Examples of fraud against the Fund may also include your failure to notify the Fund Office of your divorce; your acceptance of payment from an Employer for hours of work that should have been reported to the Fund but were not, where the Employee knew or should have known that the Employer would not report the hours. Where a Participant is found to have engaged in fraud, the Fund may suspend or permanently discontinue coverage for the Participant and his Dependents.

(Defs.' Ex. Bulding Y at Funds 0383).  It further states in a section entitled "Required Information that:

> The falsity of any statement or the furnishing of fraudulent information or proof shall be sufficient reason for the denial, suspension or discontinuance of benefits under the Plan and, in any such case, the Trustees shall have the right to recover any benefit payments made in reliance thereon.

(*Id.*).

The Welfare Fund SPD provides that "the Board of Trustees has the sole authority and discretion to interpret or amend the terms of this SPD." (Defs.' Ex. Bulding Y, (Welfare Fund SPD), at Funds 0339).

**B.  Relevant Procedural History**

The Plaintiff filed his complaint on June 18, 2015.  He sought declaratory relief, damages, and the return of the benefits that he alleged were wrongfully terminated.  He styled his complaint in three causes of action, all brought under ERISA: his first two were both for "recovery of pension benefits," (Complaint at 7, 8); and his third "for recovery of welfare benefits, annuity fund benefits[,] and vacation fund benefits, (*id.* at 9).

On September 26, 2016, the Plaintiff filed his motion, which asked for summary judgment pursuant to Rule 56 as well as the right to amend his complaint pursuant to Rule 15.  The Plaintiff moves to add a fourth cause of action for "conflict of interests, restitution, and breach of fiduciary duty" under sections 502(a) and 502(a)(3) of ERISA.

On September 29, 2016, the Defendants filed their cross-motion for summary judgment seeking to dismiss the complaint, pursuant to Rule 56.

## II. DISCUSSION

As the Plaintiff has asked the Court to rule that he is entitled to judgment as a matter of law on all of his claims, including the cause of action which he seeks to add, the Court will first analyze whether he should be permitted to amend his complaint.

### A. As to the Plaintiff's Motion to Amend

#### 1. The Legal Standard

FED. R. CIV. P. 15(a)(2) applies to motions to amend the pleadings once the time for amending a pleading as a matter of right has expired.  It states, in pertinent part, that "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Courts have construed the rule liberally and have said that "the purpose of Rule 15 is to allow a party to correct an error that might otherwise prevent the court from hearing the merits of the claim."  *Safety-Kleen Sys., Inc. v. Silogram Lubricants Corp.*, No. 12–CV–4849, 2013 WL 6795963, at *2 (E.D.N.Y. Dec. 23, 2013) (quoting *Chapman v. YMCA of Greater Buffalo*, 161 F.R.D. 21, 24 (W.D.N.Y. 1995)); *see also Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (finding a "strong preference for resolving disputes on the merits").

A court should deny leave to amend only "in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the nonmoving party."  *Burch v. Pioneer Credit Recovery, Inc.,* 551 F.3d 122, 126 (2d Cir. 2008) (per curiam).

"The party opposing the motion for leave to amend has the burden of establishing that an amendment would be prejudicial." *Fariello v. Campbell*, 860 F. Supp. 54, 70 (E.D.N.Y. 1994); *see also European Cmty. v. RJR Nabisco, Inc.*, 150 F. Supp. 2d 456, 502–03 (E.D.N.Y. 2001); *Saxholm AS v. Dynal, Inc.*, 938 F. Supp. 120, 123 (E.D.N.Y. 1996). The opposing party likewise bears the burden of establishing that an amendment would be futile. *See Blaskiewicz v. County of Suffolk*, 29 F. Supp. 2d 134, 137–38 (E.D.N.Y. 1998) (citing *Harrison v. NBD Inc.*, 990 F. Supp. 179, 185 (E.D.N.Y. 1998)).

Proposed amendments are futile when they "would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (quoting *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012)).

Under the *Bell Atlantic v. Twombly* standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." 550 U.S. 544, 570, 127 S. Ct. 1955, 1973, 167 L. Ed. 2d 929 (2007). The Second Circuit has explained that, after *Twombly*, the Court's inquiry under Rule 12(b)(6) is guided by two principles:

> First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss and determining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (internal quotation marks and alterations omitted)).

## 2. Application to the Facts

### a. As to Whether the Plaintiff Engaged In Undue Delay in Moving To Amend

The Plaintiff contends that the Court should permit him to amend his complaint because the Defendants would not be prejudiced.  In opposition, the Defendants argue that the Plaintiff unduly delayed filing the amended complaint.  The Court finds that the Plaintiff did not engage in undue delay.

The Court finds that the Plaintiff has not engaged in undue delay because "[m]ere delay . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend."  *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981); *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 333 (2d Cir. 2000) (affirming grant of motion to amend after seven-year delay, where defendant did not show prejudice).  "The concepts of delay and undue prejudice are interrelated—the longer the period of unexplained delay, the less will be required of the non-moving party in terms of showing prejudice."  *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 47 (2d Cir. 1983).  As the Defendants do not argue that the Plaintiff has engaged in bad faith or that they would be unduly prejudiced by such an amendment, the Court will determine whether the Plaintiff's proposed additional claim is futile.

### b. As to Whether the Plaintiff's Proposed Additional Claim is Futile

The Defendants contend that the Plaintiff's proposed additional is futile because it fails to state a claim for breach of fiduciary duty under ERISA and it is duplicative.  Although the Plaintiff moves for summary judgment on this claim, he does not respond to the Defendants' arguments in any way.  In support of his motion for summary judgment on the claim, the Plaintiff only contends that the Defendants unjustly enriched themselves and that a breach of fiduciary duty under Section

502(a)(2) of ERISA can give rise to a claim for equitable relief under Section 502(a)(3) of ERISA. The Court agrees with the Defendants that the Plaintiff's claim under Section 502(a)(3) of ERISA is duplicative of his other claims, and is therefore futile.

The Plaintiff's proposed amended complaint states that his fourth cause of action for breach of fiduciary duty, conflict of interest, and restitution is brought pursuant to Sections 502(a) and 502(a)(3) of ERISA. However, Section 502(a) of ERISA does not provide a vehicle for a cause of action. Section 502(a) of ERISA, entitled "Persons empowered to bring a civil action" only has a dependent clause: "A civil action may be brought—," 29 U.S.C. § 1132(a), and does not give any rights to anyone.

However, Section 502(a)(3) does provide such a vehicle. In his memoranda in support of his motion, the Plaintiff states that "[a] breach of fiduciary duty found under ERISA Section 502(a)(2) may give rise to a claim for equitable relief under ERISA 502(a)(3)." (Pl.'s Mem of Law at 23 (internal citations omitted)). Therefore, as this offers some clarification, the Court will analyze whether the Plaintiff has stated a claim for relief under Section 502(a)(3) of ERISA.

Section 502(a)(3) of ERISA states that

> A civil action may be brought by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

29 U.S.C. § 1132(a)(3).

As to Section 502(a), the Supreme Court has said

> The language of the . . . third and the fifth [subsections] creates two "catchalls," providing "appropriate equitable relief" for "any" statutory violation. This structure suggests that these "catchall" provisions act as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy.

21

*Varity Corp. v. Howe*, 516 U.S. 489, 512, 116 S. Ct. 1065, 1077–78, 134 L. Ed. 2d 130 (1996).

The Second Circuit has interpreted this to mean that "29 U.S.C. § 1132(a)(3) [] [] may not be relied on by a claimant to pursue relief—in this case, pension benefits—available under a separate ERISA provision." *Whelehan v. Bank of Am. Pension Plan for Legacy Companies-Fleet-Traditional Ben.*, 621 F. App'x 70, 72 (2d Cir. 2015) (citing *Varity*, 516 U.S. at 515 ("[W]here Congress elsewhere provided adequate relief for a beneficiary's injury . . . relief [under § 502(a)(3)] normally would not be 'appropriate.'")), *cert. denied*, 136 S. Ct. 2463, 195 L. Ed. 2d 801 (2016); *see also Miller v. Int'l Paper Co.*, No. COTT12 CIV. 7071 LAK, 2013 WL 3833038, at *4 (S.D.N.Y. July 24, 2013) ("While ERISA § 502(a)(3) provides a vehicle for seeking equitable relief, in order to bring a claim pursuant to this Section, a plaintiff must also allege an underlying violation of some substantive provision of ERISA." (citing *Gates v. United Health Grp.,* No. 11 Civ. 3487(KBF), 2012 WL 2953050, at *11 (S.D.N.Y. July 16, 2012) (plaintiff's ability to seek equitable relief pursuant to Section 502(a)(3) "does not relieve her from having to establish an underlying violation of the statute")).

"Since *Varity,* courts have found [Section 502(a)(3)] applicable when ERISA does not elsewhere provide a remedy for a wrong suffered by plaintiff, or when plaintiff seeks additional equitable relief that differs from monetary relief sought according to the specific remedies provided in ERISA's other sections." *Klecher v. Metro. Life Ins. Co.,* 331 F. Supp. 2d 279, 286 (S.D.N.Y. 2004) (collecting cases).

The equitable relief sought by the Plaintiff encompasses:

> declaring that all rights and benefits due Babino under the Pension and Annuity Plans are vested and non-forfeitable or, in the alternative, to award Babino a money judgment for all sums due and owing; that Defendant F[unds] be restrained from taking any action against Babino which has the effect of limiting and/or precluding Babino's right to secure benefits from Defendant F[unds]; Declaring that Babino is entitled to welfare insurance coverage for himself and his dependents[,]

retroactively to April 14, 2014, that he is entitled to be reimbursed from the Funds all medical expenses and medical bills that he incurred but for the Defendants' failure to cover himself and his dependents; restraining the Defendants and the Funds from taking any similar action against Babino in the future without just cause . . . .

(Pl.'s Ex. 1 (Pl.'s Proposed Amended Complaint) at 13–14).

The "equitable relief" sought by the Plaintiff is available under another section of ERISA. Section 502(a)(1)(B) states in pertinent part: "A civil action may be brought (1) by a participant or beneficiary . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. 1132(a)(1)(B).

Therefore, the Plaintiff does not seek "appropriate equitable relief" under Section 502(a)(3) because the relief he seeks is available elsewhere, and his claim is duplicative of his claims under Section 502(a)(1)(B).  *See Varity,* 516 U.S. at 515 ("[W]here Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate' [under Section 502(a)(3) ]."); *id.* at 512 ("These 'catchall' provisions act as a safety net, offering appropriate equitable relief for injuries caused by violations that [ERISA] does not elsewhere adequately remedy."); *id.* (observing that § 502(a)(1)(B) "specifically provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and the payment of claims . . . one that runs directly to the injured beneficiary"); *Giordano v. Coca-Cola Enterprises Inc.*, No. CV-08-0391-WDW, 2011 WL 839507, at *8–9 (E.D.N.Y. Mar. 7, 2011) (dismissing the plaintiff's claim for breach of fiduciary duty because it was duplicative of his claim for benefits, and stating that "Plaintiff seeks to recover the pension benefits he believes are due unto him . . . .  This relief can be adequately achieved through his Section 1132(a)(1)(B) claim for benefits and is thus not also entitled to seek

the identical relief, even in the alternative, under Section 1132(a)(3).”); *Mead v. Arthur Andersen LLP,* 309 F. Supp. 2d 596, 598 (S.D.N.Y.2004) (“[I]t is ‘appropriate’ to allow plaintiffs to include a § 502(a)(3) claim which may provide distinct relief from a § 502(a)(1) claim; it is inappropriate to include a § 502(a)(3) claim which, as here, merely duplicates the § 502(a)(1) claim.”); *Klecher*, 331 F. Supp. 2d at 287–88 (finding that plaintiff’s proposed additional claim for breach of fiduciary duty would be futile because  whereas *Varity* holds that the “catchall” provision applies when ERISA elsewhere does not provide a remedy for a wrong, plaintiff here brings an “ordinary” denial of benefits claim for which § 1132(a)(1)(B) provides a remedy.  Plaintiff merely disputes the determination that she is not entitled to long-term benefits.  [] ERISA provides a remedy for this wrong in § 1132(a)(1)(B) . . . .”); *Mead*, 309 F. Supp. 2d at 598 (“[I]t is ‘appropriate’ to allow plaintiffs to include a § 502(a)(3) claim which may provide distinct relief from a § 502(a)(1) claim; it is inappropriate to include a § 502(a)(3) claim which, as here, merely duplicates the § 502(a)(1) claim.”); *Rubio v. Chock Full O’Nuts Corp.*, 254 F. Supp. 2d 413, 431–32 (S.D.N.Y.2003) (dismissing claim brought under § 1132(a)(3) because plaintiffs’ “suit is a ‘normal’ case of denial of benefits under an ERISA plan,” that “can be fully satisfied under § 502(a)(1)(B)”); .”); *see also Kendall v. Employees Ret. Plan of Avon Prod.*, 561 F.3d 112, 119 (2d Cir. 2009) (“claims [that] are effectively claims for money damages [are] outside the scope of § 1132(a)(3)”); *Gates*, 2012 WL 2953050, at *10 n.10 (“[P]laintiff's prayer for so-called ‘equitable restitution’ is properly characterized as a legal remedy unavailable under 502(a)(3)” (internal citations omitted)).

Accordingly, the Plaintiff’s motion to amend his complaint pursuant to Rule 15 to add a claim for breach of fiduciary duty, conflict of interest and restitution under Section 502(a)(3) is denied as futile.

**B.  As to the Parties' Cross Motions for Summary Judgment**

**1.  The Legal Standard for Summary Judgment**

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  When deciding a motion for summary judgment, "[t]he Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non–moving party.'"  *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1998)).

"[A]t the summary judgment stage the judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) (internal quotation marks omitted)).  In other words, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Barrows v. Seneca Foods Corp.,* 512 F. App'x 115, 117 (2d Cir. 2013) (quoting *Redd,* 678 F.3d at 174 (internal quotation marks omitted)).  The Court should not attempt to resolve issues of fact, but rather "assess whether there are any factual issues to be tried."  *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.,* 677 F.3d 109, 119 (2d Cir. 2012).

The movant has the burden of demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  If a nonmoving party fails to make a sufficient showing on an essential element of their case where they will have the burden of proof, then summary judgment is appropriate.  *Id.* at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to

the motion for summary judgment is not met. *Liberty Lobby,* 477 U.S. at 249.  The mere existence

of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must

be evidence on which the jury could reasonably find for that party. *See Dawson v. Cty. of

Westchester,* 373 F.3d 265, 272 (2d Cir. 2004).

### 2. The Applicable Law

ERISA creates a private right of action to enforce the provisions of retirement plans. *See*

29 U.S.C. § 1132(a)(1)(B).

A denial of benefits under ERISA "is to be reviewed under a *de novo* standard, unless the

benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for

benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S.

101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989).

If the relevant plan (or plans) vest the administrator(s) with discretionary authority over

decisions regarding benefits, "the administrator's decisions may be overturned only if they are

arbitrary and capricious." *Roganti v. Metro. Life Ins. Co.*, 786 F.3d 201, 210 (2d Cir. 2015) (citing

*Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441 (2d Cir. 1995)).

Here, arbitrary and capricious means "without reason, unsupported by substantial

evidence[,] or erroneous as a matter of law." *Pagan*, 52 F.3d at 442 (internal citations and

quotation marks omitted).  The standard is "highly deferential," and "the scope of judicial review

is narrow." *Celardo v. GNY Auto. Dealers Health & Welfare Trust,* 318 F.3d 142, 146 (2d

Cir. 2003).  "Substantial evidence is such evidence that a reasonable mind might accept as

adequate to support the conclusion reached by the decisionmaker and requires more than a scintilla

but less than a preponderance." *Tansey v. Anthem Health Plans, Inc.*, 619 F. App'x 24, 25 (2d Cir.

2015) (quoting *Miller v. United Welfare Fund,* 72 F.3d 1066, 1072 (2d Cir. 1995) (internal alterations omitted)).

Of importance here, "a district court's review under the arbitrary and capricious standard is limited to the administrative record." *Roganti*, 786 F.3d at 217 n.11 (quoting *Miller*, 72 F.3d at 1071). "This rule is consistent with the fact that nothing 'in the legislative history suggests that Congress intended that federal district courts would function as substitute plan administrators' and with the ERISA 'goal of prompt resolution of claims by the fiduciary.'" *Miller*, 72 F.3d at 1071 (quoting *Perry v. Simplicity Eng'g,* 900 F.2d 963, 966 (6th Cir. 1990)). The same holds true even when a district court reviews a claim denial under the *de novo* standard. *See Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ.*, 819 F.3d 42, 60 (2d Cir. 2016). ("[W]hen reviewing claim denials, whether under the arbitrary and capricious or *de novo* standards of review, district courts typically limit their review to the administrative record before the plan at the time it denied the claim.")

While the Plaintiff apparently concedes that the Court should review the Trustees' decision under the arbitrary and capricious standard, he does argue throughout his memoranda that the Trustees failed to comply with the Department of Labor's claims procedure regulation, codified at 29 C.F.R. §2560.503–1. The claims procedure provides as follows:

> (a) Scope and purpose. In accordance with the authority of sections 503 and 505 of the Employee Retirement Income Security Act of 1974 (ERISA or the Act), 29 U.S.C. 1133, 1135, this section sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries (hereinafter referred to as claimants).
>  . . .
> (g) Manner and content of notification of benefit determination
>> (1) Except as provided in paragraph (g)(2) of this section, the plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination. Any electronic notification shall comply with the standards imposed by 29 CFR 2520.104b–1(c)(1)(i), (iii),

and (iv). The notification shall set forth, in a manner calculated to be understood by the claimant—

> (i) The specific reason or reasons for the adverse determination;
> (ii) Reference to the specific plan provisions on which the determination is based;
> (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;
> (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review . . . .

29 C.F.R. §2560.503–1.  The Second Circuit has recently held that a plan's failure to comply with these regulations "result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the regulation in the processing of a particular claim was inadvertent *and* harmless."  *Halo*, 819 F.3d at 45.

While the Plaintiff argues throughout his memoranda that the Trustees violated these regulations, he does not acknowledge the full effect of this violation until the last full page of his memorandum in opposition to the Defendants' motion for summary judgment.  (*See* Pl.'s Mem. in Opp. to Defs.' Mot. at 26).  Nevertheless, the Court finds that it must conduct a *de novo* review because the Trustees failed to fulfill the requirements of 29 C.F.R. §2560.503–1(g).

Specifically, in their January 2014 Letter, the Trustees failed to reference the specific plan provisions on which they relied in subtracting the hours that the Plaintiff worked for Oakfield from his Pension and Annuity Funds.  The Defendants claim that the Trustees met ERISA's standards because "the Trustees' notices to [the Plaintiff] provided adequate notice of the reasons for the claim denial . . . ."  (Defs.' Reply Mem. of Law at 8).  Specifically, they claim that "[t]he notices did not mention Pension or Annuity Fund plan provisions because no such plan provisions applied, in light of [the Plaintiff's] failure to substantiate his claim that he engaged in Covered Work."  (*Id.*)

The Court disagrees.  Both the Pension and Annuity Funds have clauses similar to the one contained in the Welfare Fund, which was cited by the Trustees in their January 2014 Letter. Specifically, the Annuity Plan states:

> The falsity of any statement, material to an application, or the furnishing of fraudulent information or proof shall be sufficient reason for the denial, suspension or discontinuance of benefits under this Plan and, in any such case, the Trustees shall have the right to recover any benefit payments made in reliance thereon. An Employee's acceptance of payment in cash or otherwise from an employer (as defined in Article I, Section 1 of the Trust Agreement) for hours of work in employment covered by a Collective Bargaining Agreement or Participation Agreement with Local 282 that have not been reported to the Funds, where the Employee knew or should have known that the hours would not be reported, shall constitute sufficient reason for the Trustees, in their discretion, to deny, discontinue, suspend, reduce, or otherwise impair the Employee's nonvested benefits and those provided to his or her beneficiaries.

(Defs.' Ex Bulding O (2013 Annuity Plan), at  Funds 0150).  The Annuity Plan further states that:

> An Employee who believes that he is entitled to Employer Contributions for Covered Employment that is not reflected in the Fund Office's records of his employment history, must provide documentation of the claimed periods of Covered Employment, including but not limited to, Social Security records, pay stubs, W-2 forms, or any other proof that supports his claim. If the Employee does not produce documentation to support his claim for additional periods of work in Covered Employment, his Accumulated Share will only be calculated based on Covered Employment reflected in the Fund Office records[.] The mere submission of documentation in support of a claim of additional work in Covered Employment does not entitle an Employee to any additional Accumulated Share. The Trustees have the sole discretion and authority to determine whether the documents submitted sufficiently evidence work in Covered Employment.

(*Id.* at Funds 0138).

> Similarly, the Pension Plan states that:

> If the claimant makes a willfully false statement material to his application or furnishes fraudulent information or proof, material to his claim, benefits not Vested under this Plan . . . may be denied, suspended, or discontinued.  The Trustees shall have the right to recover any benefit payments made in reliance on any willfully false or fraudulent statement, information, or proof submitted by a Participant or Pensioner.

(Defs.' Ex. Bulding V (2009 Pension Plan), at  Funds 0279).

While these clauses relate to the payment of benefits, both the Annuity and Pension Fund are also clear about which employees are covered under the Plans.  The Annuity Fund states that an employee is a person " who is an Employee of an Employer and who is covered by a Collective Bargaining Agreement, Participation Agreement, or any other written agreement requiring Employer contributions on his or her behalf."  (Defs.' Ex. Bulding I (2011 Annuity Plan) at Funds 001951).  The Annuity Fund also makes clear that employees are only entitled to benefits for "covered employment."  (*See* Defs.' Ex. Bulding I at Funds 001960 ("Accumulated Share will only be calculated based on Covered Employment . . . .")).  Similarly, the Pension Fund states that an employee can only "earn Pension Credit for periods of work in Covered Employment . . . ." (Defs.' Ex. Bulding X at Funds 0190).  Covered employment is defined as work that is conducted "for a Contributing Employer in a position covered by a Collective Bargaining Agreement with the Union . . . ."  (Defs.' Ex Bulding X at Funds 0178)

While any or all of these plan provisions could have been referenced by the Trustees in their exclusion of the Plaintiff's Oakfield hours, the Trustees did not cite to *any* plan provisions in support of that decision.  Indeed, the Defendants argue that the Plaintiff could not be credited for those hours because he did not engage in covered work, but they failed to cite to the plan provisions that defined covered work.  While it is true that the CBAs must be referenced to truly define covered work, the Plans do define them broadly as work that is covered by the CBAs.

While the Court finds that the Trustees' failure to comply with the regulations was harmless for the reasons stated below, Defendants have not shown that their failure was inadvertent.  *Halo*, 819 F.3d at 45 (stating that claims will be renewed *de novo* unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the regulation in the processing of a particular claim was inadvertent *and* harmless")

Therefore, the Court reviews the Trustees' decision *de novo*.  *See Salisbury v. Prudential Ins. Co. of Am.*, Case No. 15-CV-9799, 2017 WL 780817, at \*3 (S.D.N.Y. Feb. 28, 2017) ("In short, *Halo* held that if the plan administrator does not strictly comply with the Department of Labor's regulation governing the processing of an employee's claim, then *de novo* review applies to the denial of benefits, regardless of whether the plan vests discretion with the administrator.").

"When applying the *de novo* standard of review, the Court reviews 'all aspects of the denial of an ERISA claim.'" *McDonnell v. First Unum Life Ins. Co.*, No. 10–CV–8140, 2013 WL 3975941, at \*11, 2013 U.S. Dist. LEXIS 110361, at \*37–38 (S.D.N.Y. Aug. 5, 2013) (quoting *Kinstler v. First Reliance Std. Life Ins. Co.*, 181 F.3d 243, 245 (2d Cir. 1999)).  The Court gives no deference to the administrative interpretation of the plan documents or its conclusion regarding the merits of the claim, but rather "reaches its own conclusion about whether the plaintiff has shown, by a preponderance of the evidence, . . . entitle[ment] to benefits under the plan." *McDonnell*, 2013 WL 3975941, at \*12, 2013 U.S. Dist. LEXIS 110361, at \*39.

### 3. Application to the Facts

As indicated, the parties have cross-moved for summary judgment.  The Plaintiff requests that the Court reverse the Trustees' decision, and award him costs of this action and reasonable attorneys' fees, because the Trustees' decision was an abuse of discretion.  The Defendants request that summary judgment be entered in their favor, and that the Court dismiss the Plaintiff's complaint because they argue that the administrative record provides substantial evidence supporting their decision.  The parties' arguments in favor of, and in opposition to, their respective motions are duplicative and overlapping.  For that reason, the motions will be considered together.  Furthermore, the Court will construe the parties' arguments in light of the *de novo* standard, which neither party fully briefed.

### a. As to Whether the Court Should Confine Its Review to the Administrative Record

The Plaintiff argues that the Defendants should not be allowed to rely on the administrative record, and that the Court should look beyond the administrative record when determining whether the Trustees abused their discretion.  In support of this contention, the Plaintiff makes four points: the administrative record is unreliable; the Defendants' request that the Plaintiff supply documentation from 1997 to July 2012 was unreasonable; their withholding of his vacation benefits illustrates their malicious intent; and that the shop steward requests and driving tickets refute the claims in the Employees' Letter.  In opposition, the Defendants contend that the Court should confine its review to the administrative record.  However the Defendants state that even if the Court considers the documents supplied by the Plaintiff after the Trustees made their decision, it is insufficient and undermines his claims.  For the reasons discussed below, the Court will consider some of the Plaintiff's proffered evidence.

As the case law above makes clear, the Court is typically confined to the administrative record that was before the Trustees whether reviewing the decision *de novo* or under the arbitrary and capricious standard.  *See Roganti*, 786 F.3d at 217 n.11; *Miller*, 72 F.3d at 1071.  However, evidence outside of the administrative record can be reviewed where the Plaintiff establishes good cause.  *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 631 (2d Cir. 2008) ("We have repeatedly said that a district court's decision to admit evidence outside the administrative record is discretionary, 'but which discretion ought not to be exercised in the absence of good cause.'" (citing *Juliano v. Health Maint. Org. of New Jersey, Inc.*, 221 F.3d 279, 289 (2d Cir. 2000))).

In *Halo*, the Second Circuit held "that a plan's failure to comply with the claims-procedure regulation *may*, in the district court's discretion, constitute good cause warranting the introduction of additional evidence outside the administrative record."  *Halo*, 819 F.3d at 45 (emphasis added).

Additionally, courts in this circuit typically consider evidence outside of the administrative proceeding if there is a demonstrated conflict of interest, and/or to determine whether the procedures afforded to the plaintiff were sufficient. *See*, *e.g.*, *Richard v. Fleet Fin. Grp. Inc. Ltd. Employee Benefits,* 367 F. App'x 230, 233 (2d Cir. 2010) (summary order) (holding that "[a]lthough extra-record evidence might sometimes be admissible to assist procedural inquiries," introduction of such evidence "to challenge [an administrator's] substantive determination" is not appropriate (citing *Zervos v. Verizon N.Y., Inc.,* 277 F.3d 635, 646–47 (2d Cir. 2002))); *Wedge v. Shawmut Design & Const. Grp. Long Term Disability Ins. Plan*, 23 F. Supp. 3d 320, 337 (S.D.N.Y. 2014) (stating that the Court would not consider evidence outside of the administrative record, because the evidence the Plaintiff sought to introduce purportedly "challenge[d] the merits of [the decision-maker's] determination," and was therefore inappropriate); *Biomed Pharm., Inc. v. Oxford Health Plans (N.Y.), Inc.,* 831 F. Supp. 2d 651, 658–59 (S.D.N.Y. 2011) (reviewing the case law surrounding "good cause" and stating that courts have permitted such evidence where there was a demonstrated conflict of interest, "when the procedures employed in arriving at the claim determination were flawed, and when an insurer's claimed reason for denying a claim was not stated in its notices to the claimant" (citing *Locher v. UNUM Life Ins. Co. of Am.,* 389 F.3d 288, 295 (2d Cir. 2004))); *Mitchell v. First Reliance Standard Life Ins. Co.*, 237 F.R.D. 50, 53 (S.D.N.Y. 2006) ("[C]ases in this circuit have allowed [] [] evidence outside of the administrative record on issues such as the 'parameters' of the administrative record, whether the administrator of the plan had a conflict of interest, and other issues relating to procedures used for adjudication by the plan administrator.") (collecting cases).

Many courts in this circuit cite to the four situations found by the court in *Nagele v. Elec.*

*Data Sys. Corp.*, 193 F.R.D. 94 (W.D.N.Y. 2000), which said that courts could consider evidence

outside the administrative record where the evidence showed:

> (i) the exact nature of the information considered by the fiduciary in making its
> decision, (ii) whether the fiduciary was competent to evaluate the information in
> the administrative record, (iii) how the fiduciary reached its decision, and (iv)
> whether, given the nature of the information in the record, it was incumbent upon
> the fiduciary to seek outside technical assistance in reaching a "fair and full review"
> of the claim.

*Id.* at 103 (citing *Miller,* 72 F.3d at 1073).

Here, the Trustees informed the Plaintiff via letter on April 14, 2014 of their decision to

terminate his coverage under the Welfare Fund, and to subtract certain hours from his Pension and

Annuity Fund credits.  Although they did not cite to plan documents for each facet of their decision,

they explained why they had made their decision; they notified him of his rights to review

documents related to the decision, to appeal, and to bring a federal civil suit upon denial of his

appeal.

Even though the letter from the Plaintiff's counsel on May 27, 2014 did not state that he

had relevant documents, or that he wished to commence an appeal, the Trustees allowed the

Plaintiff to appeal their decision.  The Trustees originally told the Plaintiff on September 8, 2014

that they would review their decision on September 23, 2014.  However, they gave the Plaintiff an

extra month to obtain documents when the Plaintiff's counsel told the Trustees that he needed

more time.  On October 28, 2014, the Trustees did not make a decision regarding the Plaintiff's

appeal; effectively extending his time to gather documents and appeal their decision.

Approximately six months after the Trustees allowed the Plaintiff to commence his appeal, on

March 15, 2015, they finally denied his appeal.  The Trustees never received any documents from

the Plaintiff to support his appeal.

34

The September 8, 2014 letter stated that "all documentation the Funds utilized in making this determination" included the Employees' Letter; an excerpt of the Plaintiff's deposition in the Oakfield lawsuit; and an extract from a report from the counsel for the Trustees, which included Zaffuto's statement.  Therefore, those documents constitute the administrative record.

The Plaintiff asks the Court to consider the following evidence outside the administrative record: barn steward reports; remittance reports from Oakfield; the seventy driving tickets supplied by the Plaintiff to the Funds on June 1, 2015 after his appeal was denied; and Bird's deposition and Pellegrino's declaration to support his claim that covered work includes more than just driving trucks.

The Defendants argue that the Trustees implicitly considered the barn steward reports for Oakfield as well as Oakfield's remittance reports because the Trustees found that the Plaintiff and Oakfield had supplied the Funds with fraudulent reports for the Plaintiff for years.

The Court will consider the barn steward reports and the remittance reports, as they relate to the nature of the information considered by the Trustees and how they reached their decision. *Id.*  Each of those reports were also in the Trustees' possession when they made their decision. Indeed, the Funds decided to terminate the Plaintiff's Welfare Fund coverage and disregard the hours he worked for Oakfield because they believed that the remittance reports and the barn steward reports were not worthy of credit.

However, the Court will not consider the driving tickets or the proffered evidence from Bird and Pellegrino.  Unlike the barn steward reports and the remittance reports, this was all evidence that was either obtained by the Plaintiff or in the Plaintiff's possession when he filed his appeal with the Trustees.  He had ample time to submit the evidence to the Trustees, but failed to submit any of it in a timely manner.

35

The driving tickets were under the control of the Plaintiff after his mother's death; and under her control before her death.  In fact, it is reasonable to suggest that the driving tickets were under the Plaintiff's control even before his mother's death, because the Plaintiff owned Coral and this Court found that Oakfield and Coral were a single entity.

The Plaintiff was afforded ample time to supply the tickets to the Trustees—six months elapsed between when the Trustees told the Plaintiff that he could appeal their decision and when they denied his appeal, and three months passed after his appeal was denied before he supplied the documents.  The driving tickets do not show that the process afforded to the Plaintiff was insufficient or that the Trustees had a conflict of interest.  Even if the Court were to consider the driving tickets, it is not clear what support they offer to the Plaintiff's case.  The driving tickets only cover seventy days from 2006 to 2009, which means that the Plaintiff was only able to supply tickets for 17.5 days per year for those years, which would account for 560 hours.

Furthermore, the tickets do not have the driver's last name, and the Plaintiff offers no evidence to support his claim that they are his daily driving tickets.  The Plaintiff concedes that he does not know if the driving tickets were kept in any particular order, and the administrative record contains evidence that the Plaintiff placed his name on driving tickets that belonged to other drivers.

Similarly, the Court will not consider the testimonial evidence of Bird and Pellegrino, because the Plaintiff has not shown good cause why the Court should consider such evidence.  Their statements do not illustrate any procedural defects in the Plaintiff's appeal process, nor do they illustrate a conflict of interest.  The Plaintiff does not offer any reasons why he did not submit these affidavits to the Trustees.  Furthermore, the evidence ignores two important points.

First, the CBAs empower the Trustees with the discretion to administer the Plans.  (*See* Defs.' Ex. Bulding O at 23–24 (the Annuity Plan) ("The Board of Trustees shall have the exclusive right, power, and authority, in its sole and absolute discretion, to administer, apply and interpret the Plan and any other Plan documents and to decide all matters arising in connection with the operation or administration of the Plan, including, but not limited to, determining the standard of proof required in any case based upon objective standards."); Defs.' Ex. Bulding V at Funds 280 (the Pension Fund) ("The Trustees shall . . . be the sole judges of the standard of proof required in any case and the application and interpretation of this Plan, and decisions of the Trustees shall be final and binding on all parties. . . .  The Trustees shall have discretionary authority to interpret and construe the terms of the Plan and any other Plan documents and to decide all matters arising in connection with the operation or administration of the Plan, including specifically, but not by way of limitation, the right to determine questions regarding Pension Credits, eligibility, amount, type and effective date of benefits, survivor rights, Beneficiary designations, marital status, disability claims."); Defs.' Ex. Bulding Y at 2 (the Welfare Fund SPD) ("[T]he Board of Trustees has the sole authority and discretion to interpret or amend the terms of this SPD.")).  While this Court engages in a *de novo* review, for the reasons stated below, the Court agrees with the Trustees' interpretation of covered work in the Plans' documents.

Second, the CBAs only list drivers as covered by the agreements.  (*See* Defs.' Ex. Bulding E (the 2002 Heavy CBA) at 854 (listing types of drivers and the wages they should receive); Defs.' Ex. Bulding G (the 2009 MTA CBA) at Funds 994 ("The terms and conditions of this Agreement shall apply to the Employees of the Employer on any day they drive a dump truck, flat bed trailer, or flo-boy.")).  While the Court is not in a position to weigh evidence, the conflict between the

affidavits and the CBAs does not constitute good cause why the Court should consider the affidavits, which are outside the administrative record.

Therefore, the Court will not consider the driving tickets or the proffered evidence from Bird and Pellegrino.

Finally, the Court notes that the on-site steward reports were not part of the administrative record. However, as stated above, the Defendants eventually analyzed the on-site steward reports during the pendency of this litigation to credit the Plaintiff with approximately 4,000 hours of the 17,500 that he claimed to have worked. In this regard, the Court asked the parties for supplemental briefs addressing how the Defendants' failure to consider the on-site steward reports until that time affected the Plaintiff's claims. (ECF No. 67).

In a second supplemental affidavit, Bulding stated that "[t]he Funds' Trustees do not generally consider on-site steward reports when they are determining whether a participant is eligible for benefits." (Second Supp. Decl. of Mario Bulding (ECF No. 73-1) ¶ 6). The Defendants further explained in their supplemental brief that the Funds typically use on-site steward reports to determine whether an employer has underreported an employee's covered hours. (Defs.' Supp. Mem. of Law (ECF No. 73) at 4).

The Plaintiff argues that the Defendants' failure to consider the on-site steward reports, along with their discounting of the barn steward reports and remittance reports, illustrates their bias against him. Conversely, the Defendants state that their consideration of the on-site steward reports shows that they are not biased against the Plaintiff. The Defendants' argument is premised on the fact that the Plaintiff bears the burden in demonstrating that he is entitled to ERISA benefits. And despite that burden, the Defendants found evidence that supported the Plaintiff's position to a certain extent.

On this issue, the Court agrees with the Defendants.  The Defendants decided to disregard the hours that the Plaintiff worked for Oakfield based on the administrative record.  They informed the Plaintiff that they were terminating his Welfare Fund coverage and disregarding his hours, and asked him to supply evidence demonstrating that he performed the claimed covered work.  This was entirely proper.  "Since the employer is in the best position to know the number of hours worked, courts have determined that the policies of ERISA are advanced by the imposition of a burden that reflects the employer's duties under ERISA."  *Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of Int'l Union of Operating Engineers, Local 15, 15A, 15C & 15D, AFL-CIO v. Eastport Excavation & Utilities Inc.*, 3 F. Supp. 3d 204, 214 (S.D.N.Y. 2014) (quoting *Demolition Workers Union v. Mackroyce Contracting Corp.,* 2000 WL 297244, at *7 (S.D.N.Y. Mar. 22, 2000)).

In responding to the Defendants' letter informing him that his coverage was terminated, the Plaintiff, through his attorney, stated that the Defendants' allegations were "belied by [their] very own documents in the nature of Steward Reports that were filed by [the] designated shop steward for Oakfield . . . ."  (SMF ¶ 104).  In the same letter, he requested all shop steward reports and remittance reports.  The Defendants provided all of the requested documentation, including the on-site steward reports.  Yet, the Plaintiff never argued that he was entitled to benefits based on those on-site steward reports.  Despite the fact that the on-site steward reports were in his possession, the Plaintiff failed to come forward with *any* evidence demonstrating that his hours should be restored.  In this way, the Plaintiff did not seem interested in having the Defendants consider the on-site steward reports.

"[A]n ERISA claimant bears the burden of establishing his entitlement to benefits."  *Roganti*, 786 F.3d at 212 (internal citation omitted).  While "[u]nder certain circumstances, it may

be arbitrary and capricious for the administrator to reject a claimant's evidence as inadequate without making a reasonable effort to develop the record further. . . . [N]othing requires plan administrators to scour the countryside in search of evidence to bolster a petitioner's case." *Id.* (internal citations, quotation marks, and alterations omitted).  The Defendants gave the on-site steward reports to the Plaintiff in September 2014.  The Plaintiff did not submit any documentation to the Trustees until months after they denied his appeal.  When the Plaintiff finally provided documentation, he did not reference the on-site steward reports in any way.  Nor did he reference the on-site steward reports in his initial complaint.  The Defendants, of their own accord, considered the on-site steward reports and credited the Plaintiff with the hours reflected in those reports.

Furthermore, even if the Court were to consider the on-site steward reports, the Plaintiff would not benefit in any way.  The Trustees already restored the hours reflected in the on-site steward reports to the Plaintiff.  That is, if the Court were to consider the on-site steward reports, he would receive the same credit hours that he has already received.

Therefore, the Court will not consider the on-site steward reports because the Plaintiff has not shown good cause why they should be considered.  While they were not part of the administrative record, the Plaintiff possessed the reports, and could have submitted and relied upon them, but failed to ever do so.  Furthermore, the Trustees have already credited the Plaintiff with the hours reflected in the on-site steward reports.

Finally, the Court disagrees with the Plaintiff's contention that the administrative record is unreliable.  The rules of evidence do not apply in ERISA administrative proceedings—instead, administrators are tasked with determining which evidence to consider, and which evidence to disregard.  *See Brown v. Bd. of Trustees of Bldg. Serv. 32B-J Pension Fund*, 392 F. Supp. 2d 434,

446 (E.D.N.Y. 2005) (stating that administrators are permitted to consider hearsay because "[t]he administrative review conducted by the Trustees in an ERISA case is not a trial, and the Trustees are not bound to follow the Federal Rules of Evidence" (citing *Karr v. National Asbestos Workers Pension Fund,* 150 F.3d 812, 814 (7th Cir. 1998) ("A pension or welfare fund trustee or administrator is not a court. It is not bound by the rules of evidence.")); *see also Vursanaj v. Building Service 32B-J Health and Pension Fund,* 1995 WL 590616, at *4 (S.D.N.Y. Oct. 4, 1995) ("The exercise of discretion involves the freedom to decide what evidence to credit or to discredit."). Therefore, the hearsay in the administrative record is permissible, and the Court sees no reason to disturb the evidence in the administrative record.

Accordingly, the Court will consider the barn steward and remittance reports, because it finds that good cause exists to include them; but the Court will not consider the Plaintiff's seventy daily driving tickets; on-site steward reports; or the testimonies of Bird and Pellegrino, because the Plaintiff has not shown good cause as to why the Court should consider them.

### b.  As to Whether the Trustees Had a Conflict of Interest

Because the Court is reviewing the Plaintiff's application for benefits *de novo*, it need not address his argument that the Trustees were affected by their conflict of interest.  That is, if a court finds that a plan operated under a conflict of interest, and further finds that the conflict of interest affected their decision, the court weighs the conflict as a factor in determining whether there has been an abuse of discretion.  *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105, 110–15 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008).  As this Court is reviewing the claims *de novo*, any possible effects of the purported conflict of interest evaporate.

In any event, the Court finds that the Trustees' purported conflict of interest did not affect their decision, and would have afforded the conflict of interest no weight.  While the Trustees

"both evaluate[] claims for benefits and pay[] benefits claims," *id.*, the Plaintiff has not demonstrated that the conflict of interest affected the Trustees' decision in any way. *See Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 138 (2d Cir. 2010) ("No weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision.").

### c.  As to the Plaintiff's Claims Against the Welfare Fund

The Defendants argue that they are entitled to summary judgment on the Plaintiff's Welfare Fund claims because the Plaintiff committed fraud, as defined by the Welfare Fund documents, by paying Coral drivers in cash, and by claiming that he engaged in covered work for Oakfield.  While the Plaintiff does not specifically address these arguments with regard to his Welfare Fund claim, he broadly contends that the Trustees' decision was not based upon substantial evidence, and that he did not commit fraud.  Upon a *de novo* review, the Court finds that the Plaintiff's welfare benefits were properly terminated.

The Welfare Fund lays out certain circumstances in which the Funds can rescind an employee's coverage.  In some of those situations, coverage may be rescinded retroactively.  The Welfare Fund Summary Plan Description ("SPD") states that:

> [T]he Fund reserves the right to terminate coverage for you and/or your Dependent(s) if you and/or your Dependent(s) are otherwise determined to be ineligible for coverage.  Pursuant to the Affordable Care Act, the coverage will not be rescinded retroactively, except in certain instances, such as if you or your Dependent(s) commits fraud or makes an intentional misrepresentation (for example, in enrollment materials, a claim, or appeal for benefits or in response to a question from the Fund administrator or its delegates).  In such cases of fraud or intentional misrepresentation, your coverage may be rescinded retroactively upon 30 days' notice.  Failure to inform the Fund Office that you or your Dependent is covered under another group health plan, and knowingly providing false information to obtain coverage for an ineligible Dependent are examples of actions that constitute fraud or intentional misrepresentations.  Coverage may also be eliminated retroactively (without notice) in cases in which it would not be considered rescission under the Affordable Care Act, such as failure to pay a

required premium or contribution toward the cost of coverage. Examples of fraud against the Fund may also include your failure to notify the Fund Office of your divorce; your acceptance of payment from an Employer for hours of work that should have been reported to the Fund but were not, where the Employee knew or should have known that the Employer would not report the hours. Where a Participant is found to have engaged in fraud, the Fund may suspend or permanently discontinue coverage for the Participant and his Dependents.
. . .
The falsity of any statement or the furnishing of fraudulent information or proof shall be sufficient reason for the denial, suspension or discontinuance of benefits under the Plan and, in any such case, the Trustees shall have the right to recover any benefit payments made in reliance thereon.

(Defs.' Ex. Bulding Y, (Welfare Fund SPD), at Funds 0383).  The SPD further states that "the Board of Trustees has the sole authority and discretion to interpret or amend the terms of this SPD." (*Id.* at Funds 0339).

The Court will in turn address the two grounds upon which the Trustees retroactively rescinded the Plaintiff's Welfare Fund benefits.

### 1.  As to the Plaintiff's Cash Payments to the Coral Employees

This Court previously found, in the Oakfield Lawsuit, that Coral should have been paying monies to the Funds.  The Plaintiff gave sworn deposition testimony that he paid his employees at Coral in cash.  (Defs.' Ex. Mackson C at 164 (stating that he sometimes paid his employees in cash because "[t]hat's what they wanted.")).  By paying his employees in cash, the Plaintiff was ostensibly able to underreport hours to the Funds.

The Court finds that this was an intentional misrepresentation to the Funds.  While not specifically listed in the examples above, it is extremely similar in nature.  That is, while the examples include employees accepting payment for hours that should have been reported to the Fund but were not, the Plaintiff here paid employees for hours that should have been reported to the Fund but were not so reported.

There is no evidence in the record refuting the Plaintiff's sworn statement that he paid cash to his Coral employees; nor does the Plaintiff dispute that he paid them in cash.  Therefore, the Court finds that the Plaintiff has not shown by a preponderance of the evidence that he is entitled to benefits.

The Plaintiff contends that he cannot be held liable for paying cash to his employees at Coral when they asked to be paid in cash.  Furthermore, he claims that when he paid his employees cash, the Court had not yet found that Oakfield and Coral were a single entity and that Coral had to pay into the Funds.  However, as this Court found, the Plaintiff used Coral to hide covered work from the Funds.  The Court found that while Coral had not been a signatory to the CBAs, Coral nevertheless owed monies to the Funds because the Plaintiff engaged in the Coral and Oakfield scheme to avoid paying into the Funds.  Indeed, the Court explicitly found that "Coral is bound by the CBA[s]," and that Coral and Oakfield were "liable for work by Coral's employees that would be covered by the relevant CBAs," including Coral driver's past work.  *Ferrara*, 904 F. Supp. 2d at 265.  The Court did not hold that Coral was bound by the CBAs from the time of the decision going forward; instead, the Court found that Coral had been bound by the CBAs during the entire relevant period, and owed the Funds money for the covered work that had been done by its employees.  Therefore, it is immaterial that Coral was not a signatory to the CBAs when the Plaintiff paid his employees in cash.

Furthermore, it is of no importance that the drivers requested cash payments.  The Plaintiff, as the owner of Coral, knew, or should have known, that he was supposed to report covered work to the Funds.  As the employer, it was the Plaintiff's duty to report his employees' covered hours.  The Plaintiff disregarded this duty, and he therefore misrepresented his employees' covered hours to the Funds.  In the same way, the Plaintiff presents no evidence supporting his contention that

the Coral drivers who received cash were treated differently than him with regards to the suspension or termination of Welfare Fund benefits.  In any event, as the owner of Coral, the Plaintiff is not similarly situated to his employees, and should therefore not be treated in the same way.  It was his duty to report covered hours, not his employees' duty.

Finally, it is of no matter that the Court did not find in the Oakfield Lawsuit that the Plaintiff engaged in fraud as a legal matter.  The Welfare SPD does not require such a finding.

Therefore, because the Plaintiff failed to make payments to the Funds, and intentionally misrepresented his employees' hours, the Plaintiff is not due benefits under the Welfare Fund and his benefits were properly retroactively rescinded.  That is, the Plaintiff has not met his burden in establishing that he is due benefits under the Welfare Fund.

## 2.  As to the Plaintiff's Reporting of Covered Work

While the finding of fraud related to cash payments alone is sufficient to terminate the Plaintiff's welfare coverage, there is also evidence that the Plaintiff intentionally misled the Funds by claiming to have worked more covered hours than he did for Oakfield.

The Welfare Fund defines an employee as "[a] person employed by an Employer in Covered Employment on whose behalf contributions are required to be made and are made to the Fund."  (Defs.' Ex. Bulding Y at Funds 355).  It defines covered employment as "[w]ork for which an Employer is required to and does make contributions to the Fund pursuant to a Collective Bargaining Agreement."  (*Id.* at Funds 354)

As stated above, both the MTA and the Heavy CBAs list truck drivers, among other drivers, as employees who are covered under the agreements.  Pursuant to the Trust Agreement, employers must submit remittance reports that reflect the number of hours that employees engaged in covered work.  Shop steward reports must reflect the number of hours that an employee drove.

45

The evidence in the administrative record includes a letter from six employees who worked for either Oakfield or Coral, or who worked for both companies. The letter, which was apparently drafted by Bassolino, informed the Trustees that the Plaintiff had asked Bassolino to list the Plaintiff as working three eight-hour tours per week, but that Bassolino had not seen the Plaintiff drive a truck since 2007, and said that he could "confirm with certainty [that] he did not drive a regular tour while [Bassolino] was [s]tewar[d]." Similarly, Zaffuto, who was also a signatory to the Employees' Letter, stated that the Plaintiff would take Zaffuto's driving tickets and write his name over Zaffuto's, so that the Plaintiff could maintain coverage under the Funds.

The Plaintiff contends that covered work encompasses more than merely driving trucks. He cites mainly to evidence from outside of the administrative record, which, for the reasons stated above, the Court does not consider. However, in the event that the Court were to consider such evidence, the Court would not find that the statements of two witnesses constitute a preponderance of evidence in light of the language in the CBAs and the Welfare Fund documents. Nor did the Plaintiff submit any evidence that he engaged in cleaning, maintenance or repair work.

As to the Plaintiff's argument that it was arbitrary and capricious for the Trustees to disregard the remittance reports and barn steward reports, again the Court disagrees. Reviewing the remittance reports and barn steward reports *de novo*, the Court also disregards them because there is substantial evidence that those records were tainted by the Plaintiff. The Employees' Letter shows that the barn steward reports were not reliable, and therefore the remittance reports were not reliable either. It was the Plaintiff's burden to produce untainted records, such as driving tickets, to prove that he engaged in covered work. He failed to meet that burden.

The Plaintiff contends that it was unreasonable for him to produce proof that he engaged in covered work. Specifically, he claims that Oakfield did not have to maintain driving tickets for

more than six years.  Initially, the Court again notes that the Plaintiff bears the burden of demonstrating that he is entitled to coverage.  *Whelehan*, 621 F. App'x at 71–72.

Second, under ERISA, an employer is required to "maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees."  29 U.S.C. § 1059(a)(1); *see also Central States, Southeast and Southwest Areas Pension Fund v. Cent. Transp., Inc.,* 472 U.S. 559, 573, 105 S. Ct. 2833, 86 L. Ed. 2d 447 (1985) (stating that employers have an affirmative duty to "furnish [] benefit plans [with] the information needed for the plans' fulfillment of their reporting duties."); *Grabois v. Action Acoustics, Inc.,* 1995 WL 662127, at *2 (S.D.N.Y. Nov. 9, 1995) ("ERISA requires employers to maintain records so that employee benefit plans may review them to determine whether benefits are due or may become due their beneficiaries.") (citing 29 U.S.C. § 1059(a)(1)).

Similarly, Section 1027 states that:

> Every person subject to a requirement to file any report . . . shall maintain a copy of such report and records on the matters of which disclosure is required which will provide in sufficient detail the necessary basic information and data from which the documents thus required may be verified, explained, or clarified, and checked for accuracy and completeness, and shall include vouchers, worksheets, receipts, and applicable resolutions, and shall keep such records available for examination for a period of not less than six years after the filing date of the documents based on the information which they contain . . . .

29 U.S.C. § 1027.  While Section 1027 states that such records must be kept for *at least* six years, Section 1059 implies that employers must keep said records indefinitely.

While not entirely applicable here, the burden in cases where a benefit fund contests the amount of contributions owed by an employer is instructive:

> [w]hile the Second Circuit has not specifically addressed the applicable standard where a benefit fund contests the amount of contributions owed by an employer, other circuits to consider the issue have held that where a benefit fund produces evidence raising genuine questions concerning an employer's failure to maintain adequate records, the burden shifts to the employer to come forward with evidence

47

> either of the precise number of hours worked or to negate the reasonableness of the
> inferences to be drawn from the plaintiff fund's evidence.

*Gesualdi v. RRZ Trucking Co., LLC,* 2011 WL 1988374, at *4 (E.D.N.Y. May 20, 2011) (internal citations and quotation marks omitted); *accord Duffy v. East Port Excavation & Utilities Contractors, Inc.,* 2013 WL 5309758, at *4 (E.D.N.Y. Sept. 9, 2013). "The rationale behind the shifting of the burden is based on the fact that ERISA imposes a duty on the employer to keep accurate records of the hours worked." *Local 282 Welfare Tr. Fund v. A. Morrison Trucking, Inc.*, No. CV-92-2076(JMA), 1993 WL 120081, at *1 (E.D.N.Y. Mar. 30, 1993); *see also Brick Masons Pension Trust v. Indus. Fence & Supply Co.,* 839 F.2d 1333, 1338 (9th Cir. 1988) ("An employer cannot escape liability for his failure to pay his employees the wages and benefits due to [employees] under the law by hiding behind his failure to keep records as statutorily required."). As the individual who was controlling Coral and Oakfield, the Plaintiff has the burden of keeping proper records. As discussed above, the Plaintiff was only able to furnish 70 driving tickets, long after his appeal was denied, and the Court will not consider those driving tickets.

Of importance, the administrative record does not contain any reliable evidence that the Plaintiff engaged in covered work for Oakfield. While the remittance reports and barn steward reports reflect that he engaged in covered work, the Employees' Letter and the information from Zaffuto call those reports into serious doubt. In this regard, there is substantial evidence that the Plaintiff misrepresented his hours to the Funds. The Court finds that the Plaintiff has not met his burden in establishing that he is entitled to benefits under the Welfare Fund, and that his Welfare Fund benefits should be retroactively rescinded.

Accordingly, the Defendants' motion for summary judgment dismissing the Plaintiff's claims against the Welfare Fund is granted; and the Plaintiff's motion for summary judgment on his Welfare Fund claims is denied.

### d.  As to the Plaintiff's Claims Against the Pension and Annuity Funds

The Plaintiff contends that the Pension and Annuity Funds do not provide a vehicle for the Funds to disregard hours; that he is owed his pension credits because he is fully vested and they are non-forfeitable; and that the Trustees failed to specify the Plan provisions they relied upon in making their determinations.  In opposition, the Defendants again argue that they have broad discretion in interpreting the Plans and interpreted them correctly.  While neither party fully briefed *de novo* review, the Court interprets these arguments in light of the Court's *de novo* review.

The Pension Fund SPD states that "[y]ou may participate in the Plan if you work for a Contributing Employer in a position covered by a Collective Bargaining Agreement with the Union . . . .  Such employment is referred to as "Covered Employment."  (Defs.' Ex. Bulding X at Funds 0178).  Furthermore, it states that "[y]ou earn Pension Credit for periods of work in Covered Employment . . . ."  (*Id.* at Funds 0190).

Similarly, the Annuity Plan defines an employee as "a person who is an Employee of an Employer and who is covered by a Collective Bargaining Agreement, Participation Agreement, or any other written agreement requiring Employer contributions on his or her behalf."  (Defs.' Ex. Bulding I at Funds 001951).

As stated above, the MTA and Heavy CBAs state that drivers are covered under the agreements.

The Court's reasoning in analyzing the Plaintiff's Welfare Fund claims applies with equal force here.  Again, the Court emphasizes that the Pension and Annuity Fund documents are clear that employees only receive credit for engaging in covered work, as defined in the CBAs.  The relevant CBAs here state that only drivers are covered under the agreements.  The evidence in the record casts serious doubt on whether the Plaintiff engaged in covered work for Oakfield.  The

administrative record contains no evidence supporting the Plaintiff's contention that he engaged in covered work.  Therefore, the Plaintiff should not have ever been credited with the hours he claimed to have worked for Oakfield.

While it is true that there is no explicit clause in any of the Welfare Fund or Annuity Fund's documents that state that the Funds will disregard any hours not spent engaged in covered work, the Court does not believe that such a clause is necessary.  It is certainly logical that if an employee only receives credit for covered work, any hours incorrectly credited to an employee's account will be disregarded or subtracted from that employee's total.  Here, the evidence shows that the Plaintiff incorrectly received credit for the hours he claimed to have worked at Oakfield.

The Plaintiff also cannot avail himself of the Funds' vesting provisions in regard to his Oakfield hours.  The Annuity Plan states that "[t]he benefits to which an Employee *is entitled* under this Plan are nonforfeitable, subject only to conditions as to application, and willful misrepresentation . . . ."  (Defs.' Ex. Bulding O at Funds 0157 (emphasis added)).  First, the Court notes that the Plan states that an employee may forfeit the Annuity Plan benefits to which he is entitled if he makes willful misrepresentations, as the Court finds that the Plaintiff did here.  However, of equal importance, only those benefits to which an employee *is entitled* are nonforfeitable.  Here, the Plaintiff is not entitled to the credits he received while working for Oakfield because he did not engage in covered work.

Similarly, the Pension Plan provides that employees are only credited with "vesting service" for engaging in covered employment.  (Defs.' Ex. Bulding X at Funds 0192).

Finally, the Court notes that the Trustees did not revoke the Planitiff's benefits under either the Welfare or Annuity Plans; they merely disregarded the hours he claimed to have engaged in covered work for Oakfield.  The clauses cited by the Plaintiff relate to benefits broadly, not to the

50

calculation of hours in which an employee engaged in covered work.  Upon a *de novo* review, the Court agrees with the Trustees' decision.

As stated above, the evidence in the administrative record casts serious doubt as to whether the Plaintiff engaged in covered work for Oakfield.  The Plaintiff did not supply any evidence supporting his claim that he engaged in this work before his appeal was denied.  The Plaintiff admitted in his deposition that he could not identify any individuals similarly situated to him who the Funds "have permitted and continue to permit . . . to participate in and receive pension benefits . . . ."  (Defs.' Ex Mackson H at 70).

Therefore, the Court finds that the Plaintiff has failed to meet his burden in demonstrating, by a preponderance of the evidence, that he is entitled to credit in the Annuity and Pension Funds for the hours he worked for Oakfield.  Accordingly, the Defendants' motion for summary judgment dismissing the Plaintiff's Pension and Annuity Fund claims is granted; and the Plaintiff's motion for summary judgment on those claims is denied.

### e.  As to the Funds' Withholding of the Plaintiff's Vacation Funds

The Defendants argue that the Plaintiff's claims against the Vacation Fund fail for three reasons: his claims are mooted by the restoration of his Vacation Fund credits; he has failed to administratively exhaust his claims; and ERISA preempts any state law claims against the Vacation Fund.  The Plaintiff does not respond to any of these arguments in any meaningful way. The Court finds that the Plaintiff failed to exhaust his administrative remedies, and that ERISA preempts any of the Plaintiff's state law claims against the Vacation Fund.

"The general rule is that exhaustion [of a Plan's internal administrative procedures] is required for ERISA claims."  *McCulloch v. Bd. of Trustees of SEIU Affiliates Officers & Employees Pension Plan*, 686 F. App'x 68, 69 (2d Cir. 2017) (noting that a possible exception is

claims based on a statute) (citing *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993); *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1199 (2d Cir. 1989)). As the Plaintiff's claim is not statutory, that is, in order "[t]o determine whether [the Plaintiff] had the right he asserts, the [] court would [] need[] to construe specific terms of the Plan," *id.*, he was required to exhaust his administrative remedies. The Plaintiff has not introduced any evidence that he appealed the Defendants' withholding of his vacation benefits.

Therefore, the Plaintiff failed to exhaust his administrative remedies, and his ERISA claims against the Vacation Fund may not proceed.

As to the Plaintiff's state law claims against the Vacation Fund, those claims must be dismissed as well.

The Supreme Court has held that ERISA completely preempts many state law causes of action implicating employee benefit plans. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 208, 124 S. Ct. 2488, 2496, 159 L. Ed. 2d 312 (2004) ("The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans.").

In *Davila*, the Supreme Court established a two-pronged test to determine whether a state law claim is preempted by ERISA. A cause of action is preempted if (1) the plaintiff, "at some point in time, could have brought his claim under ERISA § 502(a)(1)(B)," and (2) "there is no other independent legal duty that is implicated by a defendant's actions." *Davila*, 542 U.S. at 210.

The Second Circuit has divided the first *Davila* prong into two steps: (a) "whether the plaintiff is the type of party that can bring a claim pursuant to § 502(a)(1)(B)," and (b) "whether the *actual claim* that plaintiff asserts can be construed as a colorable claim for benefits pursuant to § 502(a)(1)(B)." *Montefiore Med. Ctr. V. Teamsters Local 272*, 642 F. 3d 321, 328 (2d Cir. 2011) (emphasis in original). "The *Davila* test is conjunctive—that is, a state-law claim is preempted

only if both prongs of the test are satisfied." *McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna U.S. Healthcare*, No. 15-cv-2007, 2015 WL 2183900, at *3 (S.D.N.Y. May 11, 2015) (citing *Montefiore*, 642 F.3d at 328).

As the Plaintiff brought ERISA claims against the Vacation Fund under § 502 of ERISA, he clearly meets both of the *Davila* and *Montefiore* prongs. That is, the Plaintiff is both the type of party who could have brought a claim pursuant to § 502(a)(1)(B), and the actual claim that he brought is colorable under that section.

As stated above, Section 502(a)(1)(B) of ERISA states in pertinent part: "A civil action may be brought (1) by a participant or beneficiary . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. 1132(a)(1)(B). The Plaintiff, through his state law claims, merely seeks to enforce and/or clarify his purported rights under the terms of the Vacation Fund. Therefore, his claims are colorable under Section 502(a).

The Court notes that merely because the Court has found that the Plaintiff failed to administratively exhaust his claims does not mean that he could not "at some point in time, [] have brought his claim under ERISA § 502(a)(1)(B)." *Davila*, 542 U.S. at 210. That is because "a failure to exhaust ERISA administrative remedies is not [a] jurisdictional [requirement], but is an affirmative defense." *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 446 (2d Cir. 2006). Said differently, the Plaintiff was not prevented from bringing suit under ERISA for his vacation benefits, nor was his claim not colorable. However, his ERISA claims necessarily fail because he did not exhaust his administrative remedies. In view of the fact that the Plaintiff is the type of party who could have brought his state law claims under § 502(a)(1)(B), and those claims were colorable under that section, his state law claims are preempted by ERISA.

Therefore, the Plaintiff's state law claims against the Vacation Fund are preempted by ERISA.  The Court does not reach the Defendants' arguments that the Plaintiff's claims against the Vacation Fund are moot.  Accordingly, the Defendants' motion for summary judgment dismissing the Plaintiff's claims against the Vacation Fund is granted.

## III.  CONCLUSION

For the above stated reasons, the Plaintiff's motions to amend his complaint pursuant to Rule 15 and for summary judgment pursuant to Rule 56 are denied in their entirety.  The Defendants' motion for summary judgment, dismissing all of the Plaintiff's claims, is granted in its entirety.  The Clerk of the Court is respectfully directed to close the case.


It is **SO ORDERED:**

Dated:  Central Islip, New York

October 4, 2017


_____/s/ Arthur D. Spatt_____

ARTHUR D. SPATT

United States District Judge